RAYMOND M. HAYES *vs.* CITY OF REVERE & others.[1]

Suffolk. January 14, 1987. — September 1, 1987.

Present: PERRETTA, QUIRICO, & KASS, JJ.

*Police,* Compensation, Incapacity, Sick leave. *Municipal Corporations,* Police.

Where the question before a medical panel, appointed to determine a police officer's medical condition in proceedings by the officer seeking an accidental disability retirement from a city under G. L. c. 32, § 7 (1), was the same as that which would have been put to a physician in a proceeding by the officer seeking sick-leave benefits under G. L. c. 41, § 111F, and where the officer and his medical records were examined by the medical panel, it was held that the city could rely upon the panel's report to satisfy the terms of both c. 41, § 111F, and the city's obligations under a stipulation entered into by the parties that the officer would remain on the payroll "until after he is examined and a report is returned from a physician appointed by the [city] to examine said plaintiff under Chapter 41, § 111F." [675-678]

In an action brought against a city and certain of its officials by a police officer seeking sick-leave benefits under G. L. c. 41, § 111F, as the result of symptoms of angina pectoris he experienced immediately after a high-speed automobile chase, summary judgment was properly entered for the defendants, where the medical evidence presented showed that the plaintiff's underlying coronary artery disease was not caused by the high-speed chase, the only incident to which the plaintiff attributed his illness. [678-679]

CIVIL ACTION commenced in the Superior Court Department on December 8, 1981.

The case was heard by *George W. Cashman,* J., sitting under statutory authority.

*Patricia A. Donoghue* for the plaintiff.
*Ira H. Zaleznik* for the defendants.

---

[1] The chief of police, city treasurer, and city auditor.

PERRETTA, J. Claiming that he had not recovered from a work-related injury, the plaintiff police officer brought an action in the Superior Court when the defendant chief of police ordered him back to work. The plaintiff had spent all available sick and vacation days and sought sick-leave under G. L. c. 41, § 111F. At approximately the same time as bringing his complaint, the plaintiff applied for an accidental disability retirement under G. L. c. 32, § 7(1). Pending trial on his complaint in the Superior Court, the plaintiff sought to enjoin the defendants from removing his name from the payroll. His request for injunctive relief was not pursued, because he and the defendants entered into a stipulation which provided, in applicable part, that he would remain on the payroll "until after he is examined and a report is returned from a physician appointed by the City of Revere to examine said plaintiff under Chapter 41, § 111F." Thereafter, a regional medical panel, appointed to determine the plaintiff's medical condition in the c. 32 proceedings, reported that the plaintiff was totally disabled but not as a result of an injury sustained in the performance of his duties. The defendant chief of police then ordered the plaintiff back to work and advised him that, if he did not report for duty, his name would be removed from the payroll. The plaintiff then pursued his request for a preliminary injunction. When it was denied, he moved for summary judgment, arguing that, as he had never been examined by a designated physician in accordance with the terms of the stipulation and c. 41, § 111F, he was entitled to sick-leave as matter of law. The judge concluded that the defendants could rely upon the medical panel's report and by reason of that report the plaintiff was not entitled to sick-leave benefits. We affirm.

I. *The Injury and Subsequent Proceedings.*

We relate the facts as they appear from the pleadings, the plaintiff's affidavit, and the various exhibits presented on the motion for summary judgment.[2] On October 2, 1981, the plaintiff, acting in the course of his duties as a police officer, was

---

[2] There is nothing in the record appendix to show that the defendants filed counter affidavits.

involved in a high-speed automobile chase. Immediately after the chase, he developed "tightness in the anterior chest, with shortness of breath and a clammy feeling." He went to a hospital where he received emergency medical treatment. The plaintiff was diagnosed as having an "aortic stenosis, with chest pain" and hospitalization was recommended. The plaintiff elected, however, to leave the hospital and be seen by his own physician.

From a letter dated October 30, 1981, written by Dr. Elliot L. Sagall to the plaintiff's attorney, we learn that on October 26th, Dr. Sagall did a "cardiac consultation and evaluation" of the plaintiff. Dr. Sagall reports that shortly after the plaintiff had his blood pressure checked in August of 1981, he consulted a Dr. Steven H. Lefkowitz. After conducting various studies, Dr. Lefkowitz diagnosed the plaintiff as suffering from "moderate aortic stenosis and insufficiency and occult coronary artery disease indicated by calcification of the left coronary artery."

Based upon his own examination of the plaintiff and the various medical reports on the plaintiff that he reviewed, Dr. Sagall was of the opinion: "[T]his man is suffering from symptomatic aortic valvular heart disease with aortic stenosis and regurgitation and underlying coronary artery disease with recent, new onset angina pectoris on extremes of exertion, cardiac conditions which permanently disable this man from performing all of the duties of a police officer." It was Dr. Sagall's recommendation that the plaintiff "undergo cardiac catheterization to determine the anatomic status of his aortic valve and coronary arterial tree and need at this time for an aortic valve replacement and coronary artery bypass surgery."[3]

On November 19, 1981, the plaintiff filed a "duty report of injury or illness," setting out that after an "auto chase" on October 2, 1981, he experienced "tightness in anterior chest

---

[3] The plaintiff was also examined on December 11, 1981, by Dr. Farouk Pirzada at the request of the defendant chief of police. Dr. Sagall conducted another examination of the plaintiff on March 30, 1982. The findings of Drs. Lefkowitz, Sagall, and Pirzada, as well as their diagnoses, are all consistent.

and shortness of breath and a clammy feeling." He identified Dr. Sagall as his attending physician and authorized the release of all his medical records. Rather than placing the plaintiff on sick-leave under c. 41, § 111F, the defendant chief of police placed him on leave due to illness.

When the plaintiff had exhausted all his sick days and vacation time, he brought this action, filed on December 8, 1981, seeking c. 41, § 111F, sick-leave pay. He also sought an accidental disability retirement under c. 32, § 7. Although we do not know the date of the plaintiff's application under c. 32, § 7, we are informed by the judge's memorandum of decision that the application was denied by the Revere retirement board on September 28, 1982, and that on October 2, 1982, the plaintiff filed an appeal of the denial to the Massachusetts Contributory Retirement Appeals Board (CRAB).

While that appeal was pending, the plaintiff, on October 29, 1982, filed a motion in the Superior Court asking that the defendants be preliminarily enjoined from removing his name from the payroll. As we have noted, that motion was not pursued because of the stipulation entered into by the parties on November 4, 1982. On April 13, 1983, CRAB remanded the accidental disability retirement case to the Revere retirement board "based on the findings of new medical evidence," and it ordered that a medical panel be appointed to review the new medical records. The plaintiff and the medical records were evaluated by the medical panel on April 2, 1984, and on April 25, the Revere retirement board again denied the plaintiff's application for an accidental disability retirement. That decision has been appealed.[4]

The report of the medical panel provides, in pertinent part: "[The plaintiff] does indeed suffer from aortic valvular disease and is indeed totally disabled from his prior occupation as a Police Officer. However, the Panel felt that the initial symptomatology, which took place October 2, 1981, was in-

---

[4] Other than the report of the medical panel, we have no information concerning the plaintiff's application for an accidental disability retirement. The facts pertaining to that application, as we have recited them, appear in the judge's written decision.

deed causally related to the high speed chase and the anxiety provoking situation superimposed on his underlying aortic valvular disease. The Panel could not state that the continuing symptomatology from that date relate to his work as a Police Officer. It was the consensus . . . of the Panel that his disability is not the natural and proximate result of the accident or hazard undergone on account of which retirement was claimed. The Panel recognized that his aortic valvular disease, with reasonable medical certainty, existed for some period of time prior to his being taken into the Police Force and that the murmur that was noted at the time of the initial physical examination at age 33, in all probability represented that aortic valvular disease."[5]

That report is dated April 4, 1984, and is directed to the Revere retirement board, presumably pursuant to CRAB's order of April 13, 1983. On April 27, 1984, the defendant chief of police wrote to the plaintiff, ordering him back to work and advising him that a failure to report for duty would result in the removal of his name from the payroll. The plaintiff then pursued his motion for injunctive relief, but that motion was denied on the stated basis of the parties' stipulation and the report of the medical panel. The plaintiff next moved for summary judgment. It was, and is, the plaintiff's contention that as matter of law he is entitled to sick-leave benefits under c. 41, § 111F, until such time as a specifically designated physician determines that the incapacity he sustained as a result of the high-speed chase on October 2, 1981, no longer exists.

II. *Reliance upon the Medical Panel's Report.*

We think that, in the circumstances of this case, the defendants could rely upon the report of the medical panel to satisfy their obligations under the stipulation and c. 41, § 111F. The determinations to be made in considering the plaintiff's applications for sick-leave benefits under c. 41, § 111F, and for an accidental disability retirement under G. L. c. 32, § 7(1), are

---

[5] It is noted by the medical panel in the beginning of its report that, when the plaintiff became a police officer at age 32, he passed the necessary physical examination but "[i]t is of interest that a heart murmur was noted at . . . [that] time."

substantially the same, if not identical. The first paragraph of G. L. c. 41, § 111F, as appearing in St. 1964, c. 149, reads in pertinent part: "Whenever a police officer . . . of a city . . . is *incapacitated for duty because of injury sustained in the performance of his duty* without fault of his own . . . he shall be granted leave without loss of pay for the period of such incapacity" (emphasis supplied). General Laws c. 32, § 7(1), as in effect prior to St. 1982, c. 630, § 18, provided: "Any member in service . . . who becomes totally and permanently *incapacitated for further duty . . . by reason of a personal injury sustained* or a hazard undergone *as a result of, and while in the performance of, his duties* at some definite place and at some definite time . . . without serious and willful misconduct on his part . . . subject to the conditions set forth in . . . [c. 32, § 16(1)] and in this section, shall be retired for accidental disability . . ." (emphasis supplied). Hence, in the present case the threshold inquiry for determination under both c. 41, § 111F, and c. 32, § 7(1), is whether the plaintiff sustained a personal injury in the performance of his duties. Compare *DiGloria* v. *Chief of Police of Methuen,* 8 Mass. App. Ct. 506 (1979), and a related case, *Methuen Retirement Board* v. *Contributory Retirement Appeal Board,* 384 Mass. 797 (1981), where different questions were at issue: whether the police officer's injury was sustained *"without fault of his own"* under § 111F, in contrast to the standard under § 7(1), which is whether the injury was sustained "without *serious and willful misconduct* on his part" (emphasis supplied).

Pursuant to c. 32, § 7, the medical determinations are made by an independent regional medical panel, appointed and convened in accordance with c. 32, § 6(3), as appearing in St. 1982, c. 630, § 17. Section 6 provides that the accidental disability retirement applicant be examined and be given an evidentiary hearing by and before three registered physicians who are "appointed by the commissioner of public employee retirement after consultation with representatives of the Massachusetts Medical Society and the department of public health." Two of the three physicians comprising the panel "shall, so far as practicable, be skilled in the particular branch of medicine

or surgery involved in the case." The applicant's right of review from an adverse determination is provided for by c. 32, § 16(4).

Chapter 41, § 111F, on the other hand, simply provides that the injured police officer shall be entitled to sick-leave pay for the period of the incapacity, "provided, that no such leave shall be granted . . . for any period after a physician designated by the board or officer authorized to appoint police officers . . . in such city . . . determines that such incapacity no longer exists."

Relying upon *Jones* v. *Wayland,* 4 Mass. App. Ct. 725, 733-734 (1976), *S.C.,* 374 Mass. 249, 257-258 (1978), 380 Mass. 110 (1980), the plaintiff argues that as matter of law, whether a period of incapacity no longer exists for purposes of § 111F must be answered by a specially designated physician. We do not read *Jones* as precluding the defendants from relying upon the medical panel report prepared pursuant to c. 32, § 7. In *Jones,* the physician appointed under § 111F had never diagnosed the officer's condition which caused his period of incapacity. That physician, therefore, had never determined whether the officer's period of incapacity had ended. Rather, it was the officer's personal optometrist and neurologist who determined that, because of a work-related injury, the officer had lost most of the vision in his left eye, that he was suffering from post-traumatic hysterical amblyopia, and that his condition could continue indefinitely.

In the present instance, the plaintiff's condition was diagnosed from the outset by his own physicians as well as those serving as independent regional medical panelists. There is no dispute concerning the plaintiff's condition. See note 3, *supra.* Although there is nothing in the record appendix that indicates that the defendant city appointed a physician to examine the plaintiff under § 111F, as provided for in the parties' stipulation and in § 111F, it does not follow from that failure that the defendants thereby violated the purpose and intent of either the stipulation or the statute. See *Jones* v. *Wayland,* 374 Mass. at 260, *S.C.,* 380 Mass. 110, 121-122 (1980).

At the time the parties entered into their stipulation (November 4, 1982), the plaintiff's appeal to CRAB was pend-

ing. The chronology of events gives almost overwhelming support to the inference that the defendants were awaiting the results of that appeal, which ultimately required the appointment of a medical panel, before taking any action under the stipulation or § 111F. Such inaction by the defendants seems prudent rather than dilatory. Compare *Vrabel* v. *Mayor of Somerville,* 13 Mass. App. Ct. 961, 963 (1982). Within ten days of the date of the medical panel's report to the Revere retirement board, the defendant chief of police ordered the plaintiff to report for duty. See *Hennessey* v. *Bridgewater,* 388 Mass. 219, 225-226 (1983).

Further, the defendants' inaction worked to the benefit of the plaintiff who was on sick-leave status throughout this entire period. During this time, he, of course, knew of the c. 32 proceedings and, indeed, participated in the evaluation and examination by the medical panel. It does not appear that the plaintiff sought a stay of either the c. 32 proceedings or the present action pending the outcome of the other. Compare *DiGloria* v. *Chief of Police of Methuen,* 8 Mass. App. Ct. at 509 n.3, and *Methuen Retirement Board* v. *Contributory Retirement Appeal Board,* 384 Mass. at 798 n.2. We do not imply that the plaintiff could not protect himself by seeking sick-leave benefits and, if unable to return to work, an accidental disability retirement. His actions were entirely appropriate.

In these circumstances, however, we conclude that, where the question before the medical panel is the same as that which would be put to a physician under § 111F, and where the plaintiff and his medical records were examined by the medical panel, the defendant city could rely upon the report to satisfy the terms of the stipulation and statute. Whether the defendants' decision to remove the plaintiff from sick-leave status is to be upheld now turns upon the origin of the plaintiff's incapacity as shown by the report.

III. *Termination of § 111F Benefits.*

If the plaintiff's condition had developed gradually while he was a police officer, his disease might be found to be work-related. See *Zerofski's Case,* 385 Mass. 590, 592-593 (1982), and cases therein collected. See also *Blair* v. *Selectmen*

*of Brookline, ante* 261 (1987), where there was evidence to show that the officer's hypertension was caused by specific incidents which occurred in the performance of his duty. Here, however, the evidence shows that the plaintiff's disease is not work-related and that his condition existed at the time he became a member of the police force. The symptoms he experienced on October 2, 1981, were the natural effect of the exertion of the chase upon his heart condition. His heart disease is not a work-related compensable injury. See *Burns's Case,* 266 Mass. 516 (1929), cited in *Zerofski's Case,* 385 Mass. at 593.

It is not necessary to consider the plaintiff's further claim that he is entitled to the benefit of the presumption provided for by G. L. c. 32, § 94, as amended through St. 1971, c. 1012, § 16, the so-called "heart law." See and compare *Vaughan* v. *Auditor of Watertown,* 19 Mass. App. Ct. 244 (1985), with *Blair* v. *Selectmen of Brookline, supra* at 264-265. That presumption is not conclusive and is lost when it is "shown by competent evidence" that the disabling heart condition was not "suffered in line of duty." We conclude, as matter of law, that the medical evidence here presented shows that the plaintiff's heart disease was not caused by the high-speed chase, the only incident to which the plaintiff attributes his illness.

IV. *Conclusion.*

We think it important to stress the limited issue before us on this appeal. All that we have decided is that summary judgment was properly entered for the defendants. See Mass.R.Civ.P. 56(c), 365 Mass. 824 (1974) ("Summary judgment, when appropriate, may be rendered against the moving party"). Because of the procedural posture taken by the plaintiff in this case, there were no factual questions in dispute, and we have decided the appeal on that basis. By our decision, we intimate no opinion as to any claims that the plaintiff may have under G. L. c. 32, § 6 or § 7, where additional or conflicting evidence may be, or might have been, presented.

*Judgment affirmed.*